**NORTHWEST MINING ASSOCIATION,**
Plaintiff,

v.

**Bruce BABBITT, Secretary, U.S. Department of Interior; et al., Defendants.**

**Civil Action No. 97–1013 (JLG).**

United States District Court,
District of Columbia.

May 13, 1998.

William Perry Pendley, Steven J. Lechner (Pro hac vice), Todd S. Welch, Denver, CO, for Plaintiff.

Ruth Ann Storey, U.S. Dept. of Justice, Environment and Natural Resources Div., Natalie Eads, Office of Solicitor, U.S. Dept. of Interior, Jere W. Glover, Office of Advocacy, Glenn P. Harris, Office of General Counsel, Small Business Admin., Washington, DC, (amicus curiae), David P. Kimball III, David J. Armstrong, Gallagher & Kennedy, P.A., Phoenix, AZ, (Amici curiae Arizona Min. Ass'n and Nevada Min. Ass'n), for Defendants.

## MEMORANDUM

JUNE L. GREEN, District Judge.

This matter is before the Court on opposing motions for summary judgment. The Plaintiff, Northwest Mining Association ("NWMA"), disputes a final rule enacted by Defendant United States Bureau of Land Management ("BLM") concerning reclamation of mining lands. The Small Business Administration ("SBA") submitted an *amicus curiae* brief in favor of NWMA's position. The Arizona Mining Association and the Nevada Mining Association jointly submitted an *amici curiae* brief, also in favor of NWMA's position. The Court heard oral argument on March 10, 1998. For the reasons that follow, NWMA's motion is granted and the BLM's motion is denied.

## I. *Background*

In 1976, Congress enacted the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701, *et. seq.* (1994). Congress declared in the FLPMA that it is the policy of the federal government, through the Secretary of the Interior, to manage public lands "in a manner which recognizes the Nation's need for domestic sources of minerals ... from public lands[.]" 43 U.S.C. § 1701(a)(12).[1] Congress, however, also recognized the need to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values[.]" 43 U.S.C. § 1701(a)(8). Accordingly, while managing public lands under the Act, the Secretary and the BLM must "take any action necessary to prevent unnecessary or undue degradation of the lands" by "regulation or otherwise." 43 U.S.C. § 1732(b).

The BLM's obligatory duty to prevent unnecessary or undue degradation of public lands has significant application in the mining industry. The extraction of hardrock minerals, such as gold and copper, often involves the excavation of large open pits, the use of toxic chemicals, disruption of under-ground water, and various other negative environmental effects. Historically, some miners abandoned their claims after the minerals ran out and left the land disturbed. In many cases, the use of millions of dollars of public funds has been required to reclaim such old, abandoned mining operations and return them to an environmentally sound state. (Def. Mem. at 2–3.)

In 1981, the BLM responded to this problem by promulgating regulations, set forth in 43 C.F.R. § 3809, which allowed it to require bonds from miners in certain situations. Bonding ensures a miner's compliance with environmental standards by proactively funding the reclamation before the operation begins. In the event of a miner's default of its reclamation obligation, the bond, or other surety, will fund the environmental restoration, not the public. (Def. Mem. at 2–3.)

The original regulations defined three levels of mining activities: "casual" level use, where only negligible disturbance of the land results (43 C.F.R. § 3809.0–5(b)); "notice" level use, where mining operations are greater than casual use but still disturb less than five acres per calendar year and where the operator need only submit a general notification of operations to the BLM before commencement (43 C.F.R. § 3809.1–3(a)–(c)); and "plan" level use, where more than five acres per calendar year are disturbed and where the operator must submit a detailed plan of all operations and reclamation to be undertaken to the BLM for approval (43 C.F.R. § 3809.1–9(b)). The original regulations allowed the BLM to require plan level operators to post a bond to ensure the reclamation of disturbed areas, but such bonds were not mandatory to all plan level operations (43 C.F.R. 3809.1–9(b)).

On July 11, 1991, the BLM issued a notice of proposed rulemaking to amend its bonding requirement rules. The proposed rule would require bonds for all mining operations larger than casual level use. 56 Fed.Reg. 31,602 (1991). Notice level operators would be required to post a $5,000 bond for each claim, *id.* at 31,604, while plan level operators would

---

**1.** The Secretary is charged "to promulgate rules and regulations to carry out the purposes of [the] Act." 43 U.S.C. § 1740. The administrator of these rules and regulations is the Director of the BLM, through the authority and at the direction of the Secretary. 43 U.S.C. § 1731(a).

be required to post a bond in an amount specified by the BLM, but in no case to exceed $1,000 per acre for explorational operations and $2,000 per acre for mining operations. *Id.* at 31,605. Additionally, the proposed rule would allow alternative financial instruments to be substituted for bonds, *id.* at 31,602, and would require operators with a history of noncompliance with BLM regulations to file plans on subsequent operations which would normally be conducted on a notice level. *Id.* at 31,602.

The BLM stated that it would accept comments on the proposed rule amendments until September 9, 1991, *id.* at 31,602, but later extended the comment period to October 9, 1991 (56 Fed.Reg. 41,315 (1991)).

On February 28, 1997, almost six years after the original proposal, the BLM issued the final rule. 62 Fed. Reg. 9093 (1997). The final rule contained several substantive differences from the proposed rule which are pertinent to this case. Most notably, notice level and plan level operators are each required by the final rule to post bonds for 100 percent of the estimated reclamation costs. *Id.* at 9100, 9101.

Additionally, the final rule requires notice and plan level operators to employ an outside engineer to calculate and certify the cost of reclamation of the disturbed areas, *id.* at 9100–01, provide bonds for all its existing mining disturbances within ninety days (if not in compliance with the rules), *id.* at 9103, and meet water quality standards for one year at the reclaimed site before the bond would be released. *Id.* at 9102. The final rule imposed criminal sanctions on persons who knowingly violate the regulations. *Id.* at 9103.

The BLM stated that the rule, as enacted, would not have a significant impact on a substantial number of small entities. *Id.* at 9099. The BLM defined "small entity" as "an individual, small firm, or partnership at arm's length from control of any parent companies." *Id.* at 9099.

The NWMA seeks summary judgment under the Administrative Procedure Act, 5

U.S.C. §§ 551, *et seq.* (1994) ("APA") on the basis that there was no notice in the proposed rule of the 100 percent bond requirement, the professional third party engineer requirement, the water quality requirement, or of the potential criminal sanctions.

Alternatively, the NWMA seeks summary judgment under the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601, *et seq.* (1994) (*as amended by* Pub.L. 104–121, Title II, 110 Stat. 864–67 (1996)) on the grounds that, when certifying that the final rule would not have a significant economic impact on a substantial number of small entities, the BLM did not use the Small Business Administration's definition of "small miner" and did not follow the appropriate procedure for adopting an alternate definition as required by the RFA.

The BLM generally denies the NWMA's allegations and itself moves the Court for summary judgment, arguing that the NWMA lacks standing to object. The BLM alleges that, since the NWMA failed to participate in the rulemaking process by filing any comments during the appropriate period, the NWMA lacks standing to challenge the new rule under the APA.[2] The BLM also alleges that, because the NWMA is not itself a small entity, it lacks standing to challenge the new rule under the RFA.

## II. *Discussion*

The Court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## A. Standing of the NWMA

The BLM claims that the NWMA does not have standing to object to its final rule under either the APA or the RFA because it did not submit comments during the notice and comment period. The NWMA asserts that it

---

2. The NWMA asserts that, in fact, it did submit comments, but that its records of such have been

lost in the intervening five years. (Pl. Mem. At 12–13, Pl. Reply at 3–7.)

need not have submitted comments because the BLM's original rule proposal did not properly inform it that its interests were at stake. The NWMA further asserts that, in any event, it has associational standing as a representative of its members.

■ The Plaintiff is correct. The nature of the NWMA's claims under the APA is that there was insufficient notice of the altered and additional aspects of the final rule given by the BLM in its initial proposal. There is no way the NWMA could have submitted comments regarding interests it was not informed were at stake.

■ The BLM also challenges the NWMA's assertion of associational standing, contending that it does not apply to rulemaking procedures. The BLM does not provide an explanation of why this is so. In *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court refined its associational standing doctrine into a three-prong test.

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Hunt,* 432 U.S. at 343, 97 S.Ct. 2434.

The Plaintiff here meets these elements and the Court finds no basis to conclude that rulemaking should be regarded as exempt from this test. Accordingly, the Court finds that the NWMA has standing under the APA to object to the final rule at issue here.

■ The BLM also claims that the NWMA lacks standing under the Regulatory Flexibility Act because the language of the RFA extends standing to seek judicial review only to a "small entity." The RFA provides that "a small entity that is adversely affected

or aggrieved by final agency action is entitled to judicial review ...." 5 U.S.C. § 611(a)(1). Section 601(6) of the RFA states, in relevant part, that the term "small entity" shall have the same meaning as the term "small organization." Section 601(4) states, in relevant part, that the term "small organization" means "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field ...." Here, the BLM does not contest the NWMA's assertion that it is an independently owned and operated, not-for-profit enterprise which is not dominant in its field. (Pl. Mem. at 34–37.) Therefore, the NWMA is a "small entity" as defined by the RFA and has standing to object.[3]

### B. Plaintiff's Claims Under the APA

■ The standard for judicial review of the BLM's actions here is set forth in Section 706 of the APA. The court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, of otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The Court must show "great deference" to the agency's interpretation of its own powers and responsibilities. *EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980) (citation omitted).

■ The gist of the NWMA's numerous counts under the APA is that the final rule enacted by the BLM is significantly different from that originally proposed. The NWMA alleges that the differences are great enough to constitute abuses of the notice and comment requirement, 5 U.S.C. § 553(b), and the basis and purpose requirement, 5 U.S.C. § 553(c), of the APA. The final rule, however. "need not match the rule proposed [and] indeed must not if the record demands a change." *Kooritzky v. Reich,* 17 F.3d 1509, 1513 (D.C.Cir.1994) (citations omitted). To do otherwise "would lead to the absurdity that ... the agency can learn from the comments on its proposals only at the peril of starting a new round of commentary." *In-*

---

**3.** It is probable that the NWMA would also have standing to object under the RFA based on asso-

ciational standing, discussed *supra.*

ternational Harvester Co. v. Ruckelshaus, 478 F.2d 615, 632 n. 51 (D.C.Cir.1973). The test is whether the agency gave notice to interested parties that a different rule might be enacted. *Kooritzky*, 17 F.3d at 1513. Adequate notice is given if the final rule is a "logical outgrowth" of the proposed rule. *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C.Cir.1991). Therefore, the pertinent question to be asked in this case is whether the BLM's final rule is a logical outgrowth of the proposed rule.

The determination of what rule is a logical outgrowth of another can be a difficult task and require detailed examination of the administrative record. For instance, the NWMA alleges that the minimum bond amounts required by the final rule cannot be a logical outgrowth of the maximum amounts contemplated by the proposed rule. At first blush, this might seem to be one of the NWMA's strongest arguments. An examination of the administrative record reveals that the rule proposal does, indeed, state that bond amounts for plan level operations "would be capped at $1,000 per acre for exploration activities and $2,000 for mining activities." 56 Fed.Reg. 31,603. The proposal goes on, however, to state that "[c]omments are specifically requested on the adequacy of these definitions." *Id.*

The request for commentary on the definitions *reasonably* could be construed to include commentary on the adequacy of the dollar amount, which, in turn, *reasonably* could be found to constitute adequate notice that the rule might be changed. It is uncertain whether additional examination of comments received would be indicative of the adequacy of the notice. It is also uncertain whether testimony at trial might prove dispositive of the issue. In other words, the claim is not readily applied to the summary judgment standard, *i.e.*, that no reasonable factfinder could find for the BLM in this matter.

The Court does not need to conduct such an exhaustive examination of the administrative record to reach the merits of the NWMA's claims under the APA because of the disposition of their claim under the RFA.

## C. Plaintiff's Claim Under the Regulatory Flexibility Act

The NWMA's claim under the RFA is that the BLM did not follow the legal procedure required by the RFA when it issued the final rule.

■ The RFA requires administrative agencies to consider the effect of their actions on small entities, including small businesses, small non-profit enterprises, and small local governments. *See* 5 U.S.C. §§ 601, *et seq.; Southwestern Pa. Growth Alliance v. Browner*, 121 F.3d 106, 118 (3d Cir.1997). *See also* S.Rep. No. 96–878, at 1– 6 (1980). When an agency issues a rulemaking proposal, the RFA requires the agency to "prepare and make available for public comment an initial regulatory flexibility analysis" which will "describe the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). When issuing a final rule, the administrative agency must also prepare and issue a final regulatory flexibility analysis. 5 U.S.C. § 604(a).

■ Rather than prepare initial and final regulatory flexibility analyses, the BLM chose to use the exception allowed by Section 605 of the RFA. Section 605 provides:

Sections 603 and 604 of this title shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. If the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a statement providing the factual basis for such certification. The Agency shall provide such certification and statement to the Chief Counsel for Advocacy of the Small Business Administration.

5 U.S.C. § 605(b).

In a section of the final rule publication entitled "Compliance With Regulatory Flexibility Act," the BLM stated that the final rule "will not have a significant economic impact on a substantial number of small enti-

ties." 62 Fed.Reg. 9099. The BLM stated that, for the purposes of this certification under the RFA, the term "small entity" is defined as "an individual, small firm, or partnership at arm's length from the control of any parent companies." *Id.* The BLM set forth a short factual basis for the certification. *Id.*

The nature of NWMA's challenge is that the BLM did not use the correct definition of "small entity" (specifically, a small miner) when it made the "no significant impact" certification.

The RFA requires agencies to use the Small Business Administration's definition of small entity. Section 601 of the RFA sets forth, in relevant part, "[f]or the purposes of this chapter ... the term 'small entity' shall have the same meaning as the term 'small business' ...." 5 U.S.C. § 601(6). The term "small business" has the same meaning as the term "small business concern" under section 3 of the Small Business Act, 15 U.S.C. § 632 (1994). 5 U.S.C. § 601(3).

An examination of the Small Business Act reveals that the SBA may "specify detailed definitions or standards by which a business concern may be determined to be a small business concern for the purposes of [the Act] or any other Act." 15 U.S.C. § 632(a)(2)(A). The SBA publishes these small business definitions in 13 C.F.R. § 121.201. Division B of section 121.201 provides, in pertinent part, that mining concerns must have 500 or fewer employees to be considered "small." *Id.* Therefore, the standard for "small miner" which the BLM must use when performing an Initial or Final Regulatory Flexibility Analysis or when certifying "no significant impact" is a 500 or fewer employee standard. By using a definition other than the SBA's, the BLM violated the procedure of law mandated by the statute.

The BLM, for its part, argues that it used a subsequent Congressional definition of "small miner" used in recent legislation.[4] This argument is unconvincing in light of the clearly mandated procedure of the RFA. The definitions section of the RFA uses

phrases such as " 'small entity' *shall have* the same meaning ... " and " 'small business' *has* the same meaning ... .". 5 U.S.C. § 601 (emphasis added). Words such as these do not leave room for alternate interpretations by the agency. The ultimate expression of legislative intent is, of course, an unambiguously worded statute.

Insofar as the BLM's certification (*i.e.*, that the final rule would have no significant impact on a substantial number of small entities) was without observance of procedure required by law, the NWMA, as complaining party, is entitled to relief, and this Court, therefore, grants NWMA's motion for summary judgment on these grounds.

### D. Relief to be Granted Under the RFA

■ Section 611 of the RFA, entitled Judicial Review, provides, in pertinent part:

> In granting any relief in an action under this section, the court shall order the agency to take corrective action consistent with this chapter ... including, but not limited to, remanding the rule to the agency, and deferring the enforcement of the rule against small entities unless the court finds that continued enforcement of the rule is in the public interest.

5 U.S.C. § 611(4)(A)-(B). Consequently, the issue is what the public interest is here.

The BLM, arguing for continued enforcement, warns of potential publicly funded restoration efforts and cites a ten-year old report showing an estimated restoration cost of $284 million for a parcel of federal land that had been left unreclaimed. *See generally* GAO/RCED-88-123BR (April 1988).

The Court, however, is unconvinced by such anecdotal evidence. In fact, the Court does not find that much would change should enforcement be discontinued. Large, open-pit mines are already subject to discretionary bond requirements by the BLM as plan level operations. 43 C.F.R. § 3809.1-9(b). Moreover, the BLM admits that it already has in place a policy which requires 100 percent bonding for *all* mining operations which use

---

4. Specifically, the Department of the Interior and Related Agencies Appropriations Act for Fiscal

Year 1993, 106 Stat. 1374, 1378-79 (1992). (Def. Mem. at 15-26; Def. Reply at 14-15.)

cyanide or other dangerous leachates. (Def. Mem. at 6, 8; Def. Reply at 8.) In other words, to protect the environment against the most potentially dangerous mining operations, the BLM need only exercise its existing powers between a remand and its next final rule promulgation.

Moreover, the new rule's requirements concerning the amount of regulation on the smaller notice level mining operations, the dollar amounts the BLM can require for all bonds, and the additional procedural expenses incurred by miners when obtaining the bonds, appear to have a large impact on the small miner. Effects on small businesses and industry-wide changes in regulatory expenses, however, are precisely what the procedural safeguards of the RFA and the APA are set in place to address. A claim that the public interest requires an exception to the RFA and APA because of the very interests they protect requires a better showing of threatened societal harm than the BLM has produced here.

Finally, the BLM states that, upon remand, any new rule promulgation will be delayed because Congress has prohibited the BLM from publishing new hardrock mining rule proposals until November 15, 1998.[5] *See* Department of the Interior and Related Agencies Appropriations Act for Fiscal Year 1998, Pub.L. No. 105–83 § 339 (1997). While true, the BLM itself delayed enacting a new rule for roughly nine years after the issuance of the GAO report and five and one-half years after its own rule proposal. The BLM has not explained this delay in light of its alleged urgency. The absence of alacrity by the BLM in this matter convinces the Court that another brief delay will not be contrary to the public interest.

### III. *Conclusion*

While recognizing the public interest in preserving the environment, the Court also recognizes the public interest in preserving the rights of parties which are affected by government regulation to be adequately informed when their interests are at stake and to participate in the regulatory process as

directed by Congress. For this reason and for the reasons stated in this memorandum, the Court remands the final rule to the BLM for procedures consistent with this opinion. Accordingly, the Plaintiff's motion for summary judgment is granted, and the Defendant's motion for summary judgment is denied. An appropriate Order accompanies this Memorandum.

### *ORDER*

For the reasons set forth in the accompanying Memorandum and the entire record in this case, it is by the Court this 13th day of May 1998

**ORDERED** that Plaintiff Northwest Mining Association's Motion for Summary Judgment is **GRANTED**; it is further

**ORDERED** that the Defendant's Motion for Summary Judgment is **DENIED**; it is further

ORDERED that the final rule at issue here is remanded to the Defendant for procedures consistent with the attached Memorandum.

---

5. The BLM did not address this argument in its briefs, nor did it file a post-hearing brief. It

mentioned this argument briefly during oral argument only.