MINERAL POLICY CENTER,
et al., Plaintiffs,

v.

Gale NORTON, et al., Defendants,

and

National Mining Association,
Defendant–Intervenor.

No. CIV.A.01–00073(HHK).

United States District Court,
District of Columbia.

Nov. 18, 2003.

James Bryan Dougherty, Washington, DC, Jeffrey C. Parsons, Roger Flynn, Boulder, CO, for Plaintiffs.

Gregory D. Page, U.S. Department of Justice, Washington, DC, for Defendants.

Robert Timothy McCrum, Crowell & Moring, L.L.P., Washington, DC, for Intervenor Defendant.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiffs, Mineral Policy Center, Great Basin Mine Watch, and Guardians of the Rural Environment,[1] bring this action to

---

1. Plaintiff Mineral Policy Center is a nonprofit conservation organization focused on mining issues, particularly mining that occurs on public land. Plaintiff Great Basin Mine Watch is a nonprofit organization comprised of environmentalists, ranchers, and Native Americans based in Reno, Nevada that is concerned with protecting the Great Basin region's land, air, water, wildlife, and commu-

challenge the revision of federal mining regulations promulgated by defendant, Bureau of Land Management ("BLM"), United States Department of the Interior ("Interior"), on October 30, 2001.[2] According to plaintiffs, the regulations, codified at 43 C.F.R. § 3809 (2003) ("2001 Regulations") "substantially weaken, and in many instances eliminate, BLM's authority to protect the public's lands, waters, cultural and religious sites, and other resources threatened by industrial mining operations in the West." Pls.' Mot. for Summ. J. at 1. Plaintiffs therefore contend that the regulations run counter to BLM's statutory duty, as set forth in its guiding statute, the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 et seq. (2000) ("FLPMA"), to "take any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. § 1732(b). Accordingly, plaintiffs ask this court to vacate and remand any portion of the 2001 Regulations not in accordance with federal law.

Before this court are the parties' and intervenor's cross-motions for summary judgment.[3] Upon consideration of the motions, the oppositions thereto, and the record of this case, the court concludes that each motion should be granted in part and denied in part.

## I. BACKGROUND INFORMATION

### A. Regulatory Background

#### 1. The Mining Law

A correct resolution of the issues presented by this case requires an understanding and analysis of the pertinent legislative scheme and must begin with the General Mining Law, 30 U.S.C. §§ 21 et seq. (2000) ("Mining Law"), a law that was enacted in 1872. The Mining Law provides: "All valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase ... by citizens of the United States ...." 30 U.S.C. § 22. The Mining Law gives claimants the right to "a unique form of property." *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 335, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963). It gives any citizen the right to enter onto federal public lands,[4] stake a claim on these lands, and obtain the exclusive right to extract the minerals thereon-all without payment to the United States and without acquiring title to the land itself. *Union Oil Co. v. Smith*, 249 U.S. 337, 348–49, 39 S.Ct. 308, 63 L.Ed. 635 (1919). Alternatively, the Mining Law gives a claimant the right to obtain title to the lands, by proving the location of a valuable mineral deposit on her mining claim, and paying a nominal fee

nities from the adverse impacts of hardrock mining. Finally, plaintiff Guardians of the Rural Environment is a small nonprofit organization based in Yamell, Arizona that focuses on the impacts of hardrock mining in the rural West. Compl. ¶¶ 7–9. While Interior has not raised the issue of standing, the court has nevertheless satisfied itself that plaintiffs have standing to pursue the relief they seek. *See Lewis v. Casey*, 518 U.S. 343, 349 n. 1, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 431 (D.C.Cir.1998).

2. The Bureau of Land Management is an agency within the Department of the Interior.

The terms "Interior" and "BLM" are used more or less interchangeably throughout this opinion.

3. National Mining Association ("NMA") is a national trade association that represents the mining industry. Many of NMA's members explore for and produce hardrock minerals on public lands. The court granted NMA's unopposed motion to intervene on March 26, 2001.

4. "Public lands" are those lands owned by the United States and administered by the BLM, excepting Outer Continental Shelf and native trust lands. 43 U.S.C. § 1702(e).

($5.00 per acre for certain claims, $2.50 per acre for others). 30 U.S.C. §§ 29–30, 37.

### 2. The Federal Land Policy and Management Act

Much changed in this nation in the 100 years following the Mining Law's 1872 enactment. Accordingly, in 1976, Congress enacted FLPMA to amend the Mining Law and reflect the nation's changed view toward land and minerals. It is this law that is primarily at issue here.

FLPMA establishes standards for BLM to regulate hardrock[5] mining activities on the public lands. Such regulation is vital. BLM administers roughly one-fifth of the land mass of the United States[6] and, while the surface area of the land physically disturbed by active mining is comparatively small, the impact of such mining is not. *See Rocky Mountain Oil & Gas Ass'n v. Watt,* 696 F.2d 734, 737 (10th Cir.1982); Defs.' Ex. A at 1 (NRC Report). Mining activity emits vast quantities of toxic chemicals, including mercury, hydrogen, cyanide gas, arsenic, and heavy metals. The emission of such chemicals affects water quality, vegetation, wildlife, soil, air purity, and cultural resources. *See Northwest Mining Ass'n v. Babbitt,* 5 F.Supp.2d 9, 11 (D.D.C.1998) (discussing hardrock mining's environmental consequences); Pls.' Ex. 2 at ¶¶ 10, 11 (Decl. of Randolph); Defs.' Ex. A at 27–30 (NRC Report). The emissions are such that the hardrock/metal mining industry was recently ranked the nation's leading emitter of toxic pollution. Pls.' Ex. 2 at ¶ 11 (Decl. of Randolph) (citing EPA's 1998 Toxic Release Inventory, issued May 11, 2000).

FLPMA thus attempts to balance two vital-but often competing-interests. On one hand, FLPMA recognizes the "need for domestic sources of minerals, food, timber, and fiber from the public lands," 43 U.S.C. § 1701(a)(12), and, on the other hand, FLPMA attempts to mitigate the devastating environmental consequences of hardrock mining, to "protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values," *id.* § 1701(a)(8). Put another way, FLPMA "represents an attempt by Congress to balance the use of the public lands by interests as diverse as the lands themselves." *Watt,* 696 F.2d at 738; *accord Northwest Mining Ass'n,* 5 F.Supp.2d at 11; *see also* NMA's Reply at 12.

The heart of FLPMA amends and supersedes the Mining Law to provide: "In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent *unnecessary or undue degradation* of the lands." 43 U.S.C. § 1732(b) (emphasis added); *see Watt,* 696 F.2d at 738 n. 2; Defs.' Mot. for Summ. J. at 4 (recognizing that FLPMA amends the Mining Law). Also important for our purposes, FLPMA: (1) requires that the Secretary "manage the public lands under principles of multiple use and sustained yield," 43 U.S.C. § 1732(a); (2) encourages the "harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment," *id.* § 1702(c); and (3) "declares that it is the policy of the United States that ... the United States receive fair market value for the use of the public lands and their resources unless otherwise provided for by statute," *id.* § 1701(a)(9).

---

**5.** Hardrock minerals are minerals such as gold, silver, copper, and uranium. Defs.' Ex. A at 1 (NRC Report).

**6.** BLM is responsible for 260 million acres of land in the western states. Ninety percent of such lands are open to hardrock mining. Defs.' Ex. A at 1 (NRC Report).

### 3. The 1980, 2000, and 2001 Regulations

After FLPMA was enacted in 1976, BLM commenced a rulemaking to implement it. BLM issued its proposed rules on December 6, 1976, and finalized them on November 26, 1980. *See* 41 Fed.Reg. 53,428 (Dec. 6, 1974); 45 Fed.Reg. 78,902 (Nov. 26, 1980). These rules, commonly known as the "1980 Regulations," established "procedures to prevent unnecessary or undue degradation of Federal lands which may result from operations authorized by the mining laws." 45 Fed.Reg. at 78,909–10 (Nov. 26, 1980). The 1980 Regulations defined "unnecessary or undue degradation," commonly referred to as "UUD," as being: (1) "surface disturbance greater than that which would normally result when an activity is being" conducted by "a prudent operator in usual, customary, and proficient operations"; (2) "failure to comply with applicable environmental protection statutes and regulations thereunder"; and (3) "[f]ailure to initiate and complete reasonable mitigation measures, including reclamation of disturbed areas or creation of a nuisance." *Id.* at 78,910. These rules, formerly codified at 43 C.F.R. § 3809.0–5(k) (1999), governed the mining industry for quite some time.

In the 1990s, however, Interior conducted a comprehensive review of the 1980 Regulations, and on January 6, 1997, commenced a rulemaking to amend them. 62 Fed.Reg. 16,177 (Apr. 4, 1997). During the rulemaking period, Congress intervened by passing the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. Pub.L. No. 105–277, 112 Stat. 2681 (1998). Pursuant to this Act, Congress directed the National Research Council ("NRC") of the National Academy of Sciences[7] to review the adequacy of existing state and federal regulation of hardrock mining on federal lands, without regard to Interior's proposed amendments.[8] Pub.L. No. 105–277, division A, § 101(e), 112 Stat. 2681 (§ 120(a) of Gen. Provisions, Dep't of Interior) (1999). Congress also prohibited Interior from promulgating a new rule until after publication of the NRC report. *Id.* at § 120(d). The NRC published its report, entitled *Hardrock Mining on Federal Lands,* in late September 1999 ("NRC Report"). In support of this publication, later that year, Congress provided that the rule to emerge from Interior's rulemaking process must not be "inconsistent with the recommendations contained in the National Research Council report." Fiscal Year 2000 Consolidated Appropriations Bill, Pub.L. No. 106–113, App. C, 113 Stat. 1501, 1501 A–210 (§ 357 of tit. III Gen. Provisions) (1999); *see also* Dep't of Interior & Related Agencies Appropriations Act, 2001 Pub.L. No. 106–291, 114 Stat. 922, 962 (2000).

Interior finally amended the 1980 Regulations in 2000. The 2000 Regulations, which were promulgated on November 21,

---

7. The National Academy of Sciences is a self-perpetuating honorary society of prestigious American scientists founded during the Civil War by President Abraham Lincoln to give expert advice on technical matters. During World War I, President Woodrow Wilson added the National Research Council as the operating arm of the Academy.

8. Specifically, Congress charged the NRC with: (1) identifying "federal and state statutes and regulations applicable to environmental protection of federal lands in connection with mining activities"; (2) "considering the adequacy of statutes and regulations to prevent unnecessary or undue degradation of the federal lands"; and (3) recommending ways to enhance coordination between the Federal and state governments, to "ensure environmental protection, increase efficiency, avoid duplication and delay, and identify the most cost-effective manner for implementation." Defs.' Ex. A at 1 (NRC Report).

2000, and became effective in the final hours of the Clinton Administration, on January 20, 2001, adopted the NRC Report's recommendations-but differed in fundamental ways from the previous 1980 Regulations.[9] 65 Fed.Reg. 69,998 (Nov. 21, 2000). Most importantly, the 2000 Regulations replaced the 1980 Regulations' UUD "prudent operator" standard with a new and more restrictive UUD standard, commonly referred to as the "substantial irreparable harm" or "SIH" standard. 65 Fed.Reg. at 70,115 (formerly codified at 43 C.F.R. § 3809.5(f) (2001)).

The "substantial irreparable harm" standard is so named because in the 2000 Regulations, for the first time, BLM stated that it would deny a plan of operations, *i.e.*, a mining permit,[10] if the plan failed to comply with performance standards or would result in "substantial irreparable harm" to a "significant" scientific, cultural, or environmental resource value of the public lands that could not be "effectively mitigated."[11] *Id.* at 70,115. Thus, under the 2000 Regulations, BLM asserted its authority to deny a mining permit, simply because a potential site was unsuitable for mining because of, for instance, the area's environmental sensitivity or cultural importance. *See id.* at 70,016.

These 2000 Regulations were short lived, however. On March 23, 2001, after a change in the Administration, Interior published a Notice in the Federal Register stating its intention to amend the regulations once again. *See* Mining Claims Un-der the Gen. Mining Laws; Surface Mgmt., 66 Fed.Reg. 16,162 (Mar. 23, 2001).

In so doing, the Interior Solicitor issued a legal opinion examining FLPMA and concluding that the 2000 Regulation's SIH standard was *ultra vires*, a conclusion with which the Interior Secretary agreed. Defs.' Ex. H at 2 (Solicitor's Opinion). The 2001 Regulations, promulgated on October 30, 2001, thus abolished the 2000 Regulations' SIH standard. 66 Fed.Reg. at 54,837–38. What was left after the revision was a standard more akin to the "prudent operator" standard utilized by the 1980 Regulations. *Compare* 65 Fed. Reg. at 70,115, *with* 66 Fed.Reg. at 54,860. The stated reason for the elimination of the SIH standard was that Interior determined that the standard's "implementation and enforcement ... would be difficult and potentially subjective, as well as expensive for both BLM and the industry," and that "other means" would "protect the resources covered by the SIH standard." *Id.* at 54,846, 54,838. Interior further determined that the SIH standard would precipitate a "10%–30% decline overall in minerals production." 65 Fed.Reg. at 70,-107.

The 2001 Regulations provide:

Unnecessary or undue degradation means conditions, activities, or practices that:

(1) Fail to comply with one or more of the following: the performance standards in § 3809.420, the terms and conditions of an approved plan of opera-

---

**9.** NMA sought a preliminary injunction to enjoin Interior's enactment of the 2000 Regulations. NMA's challenge was rejected by this court. *Nat'l Mining Ass'n v. Babbitt,* Civ. No. 00–2998 (D.D.C. Jan. 26, 2001) (Kennedy, J.).

**10.** A "plan of operations" describes what activities the applicant proposes to conduct on public land. A plan of operations must be submitted to BLM for approval before certain mining operations may commence and must document all actions that the operator plans to take from exploration through reclamation. *See* Defs.' Ex. A at 20 (NRC Report). For a more detailed description of what a plan of operations entails, *see* 43 C.F.R. § 3809.401 (2000)

**11.** NMA dubs this standard the "mine veto" provision.

tions, operations described in a complete notice, and other Federal and state laws related to environmental protection and protection of cultural resources;

(2) Are not "reasonably incident" to prospecting, mining, or processing operations as defined in § 3715.0–5 of this chapter; or

(3) Fail to attain a stated level of protection or reclamation required by specific laws in areas such as the California Desert Conservation Area, Wild and Scenic Rivers, BLM-administered portions of the National Wilderness System, and BLM-administered National Monuments and National Conservation Areas.

43 C.F.R. § 3809.5.

The 2001 Regulations retained other provisions of the 2000 Regulations, however. Notably, for instance, Interior adopted all of the NRC's UUD recommendations, including requiring: (1) financial guarantees to cover commensurate reclamation costs for all mining activities disturbing the public lands or resources, even those affecting areas of less than five acres, 43 C.F.R. §§ 3809.552; and (2) plans of operation for all mining activities other than those defined as "Casual use" [12]

and "exploration," even where the disturbed area is less than five acres, *id.* at § 3809.1–.21. These 2001 Regulations are presently at issue before this court.[13]

## II. RELEVANT STANDARDS

### A. Summary Judgment Standard

This case is before the court on the parties' cross motions for summary judgment. Summary judgment, pursuant to Federal Rule of Civil Procedure 56, shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. Because this court's review is based upon the administrative record, summary judgment is especially appropriate. *See Bloch v. Powell,* 227 F.Supp.2d 25, 30–31 (D.D.C.2002); *GCI Health Care Centers, Inc. v. Thompson,* 209 F.Supp.2d 63, 67–68 (D.D.C.2002); *Fund for Animals v. Babbitt,* 903 F.Supp. 96, 105 (D.D.C.1995) (citing *Richards v. INS,* 554 F.2d 1173, 1177 n. 28 (D.C.Cir. 1977)).

### B. Administrative Procedures Act

Challenges to agency rulemaking are reviewed under the Administrative Proce-

---

**12.** For regulatory purposes, BLM has divided mining operations into three categories according to size and level of activity. These are: Casual use, Notice-level operations, and Plan-level operations. 43 C.F.R. § 3809.10. Casual use operations are the least intensive, involving "practices which do not ordinarily cause any appreciable disturbance or damage to the public lands, resources or improvements." 43 C.F.R. § 2800.05. Casual use operations do not utilize mechanized earthmoving equipment, truck-mounted · drilling equipment, or motorized vehicles in areas designated as closed to such vehicles, 43 C.F.R. § 3809.5, and are said to only "negligibly disturb BLM lands and resources." Defs.' Ex. A at 241 (NRC Report). Next, a Notice-level operation is a mining or exploration operation that involves more than Casual use, but causes a cumulative surface disturbance of five acres or less per year. BLM

requires that Notice-level operators submit only a Notice rather than a plan of operations. Defs.' Ex. A at 20, 244 (NRC Report). The third, and most intensive, mine category is "Plan-level operations." Plan-level operations are those operations that cause a cumulative surface disturbance of more than five acres in any calendar year. Miners can only conduct Plan-level operations after their plan of operations is approved by BLM. 43 C.F.R. § 3809.10. *Sierra Club v. Penfold,* 857 F.2d 1307, 1309 (9th Cir.1988) (explaining the categories and associated responsibilities of operators).

**13.** Plaintiffs initially filed a motion in this court for a preliminary injunction, in an attempt to stop Interior from enacting the 2001 Regulations. This motion was denied. *See* Order Denying Preliminary Injunction, Dec. 28, 2001.

dure Act ("APA"), which authorizes courts to set aside final agency actions, findings, and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2000); *see Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In making this determination, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* While this inquiry "is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency." *Id.; see also Envtl. Def. Fund v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981).

■ *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), provides the framework that governs judicial review of agency decisions. In *Chevron,* the Supreme Court set out the now-familiar two-step test for reviewing an agency's interpretation of a statute. First, the reviewing court must ask "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If, however, the statute is silent or ambiguous with respect to the specific issue, the reviewing court must defer to the agency's construction of the statute, so long as it is reasonable. *Id.* at 843, 104 S.Ct. 2778; *see also Christensen v. Harris County,* 529 U.S. 576, 586–87, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

*Chevron* and its progeny make clear that "[w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." *Chevron,* 467 U.S. at 866, 104 S.Ct. 2778. However, if a regulation unreasonably interprets a statute or is inconsistent with the statute under which it is promulgated, the regulation may not be sustained. *See United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) (stating that to be valid, regulations must be "consistent with the statute under which they are promulgated"); *INS v. Chadha,* 462 U.S. 919, 953 n. 16, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (providing that agency action "is always subject to check by the terms of the legislation that authorized it"); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213–14, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ("The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.") (citations and internal quotations omitted).

In this case, plaintiffs challenge Interior's decision to rescind a validly-issued rule and replace it with the 2001 Regulations. Rescission of agency rules that previously met Congress's legislative mandate are judged by the rulemaking record. That is, " '[a]n agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis.' " *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970)); *see Ctr. for Sci. in Pub. Interest v. Dep't of Treasury,* 797 F.2d 995, 999 (D.C.Cir.1986); *Louisiana Pub. Serv. Comm'n v. FERC,*

184 F.3d 892, 897 (D.C.Cir.1999) ("For the agency to reverse its position in the face of a precedent it has not persuasively distinguished is quintessentially arbitrary and capricious."). An agency must therefore "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

## C. Facial Challenge

■ In this case, moreover, plaintiffs mount a facial challenge to the 2001 Regulations. In so doing, according to Interior and NMA, plaintiffs assume an unusually "heavy burden" in prevailing on the merits. *Rust v. Sullivan*, 500 U.S. 173, 183, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *see United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *see also Babbitt v. Sweet Home Chapter of Communities*, 515 U.S. 687, 699–700, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995); *Reno v. Flores*, 507 U.S. 292, 301, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Chem. Waste Mgmt. v. U.S. EPA*, 56 F.3d 1434, 1437 (D.C.Cir. 1995). According to Interior and NMA, under the Supreme Court's standard set forth in *Salerno*, plaintiffs must show that "'no set of circumstances exists under which the regulations would be valid.'" NMA Mot. for Summ. J. at 19 (quoting *Rust*, 500 U.S. at 183, 111 S.Ct. 1759). *See Salerno*, 481 U.S. at 745, 107 S.Ct. 2095 ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

Plaintiffs, meanwhile, concede that they cannot clear *Salerno's* high threshold-but they challenge defendants' claim that they must. That is, plaintiffs maintain that this action, challenging the validity of an agency regulation, is *not* governed by the *Salerno* "no set of circumstances" test.

In support of their view, plaintiffs cite a D.C. Circuit case from 1998, which states:

The Supreme Court has never adopted a "no set of circumstances" test to assess the validity of a regulation challenged as facially incompatible with governing statutory law. Indeed, the Court in at least one case, *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990), upheld a facial challenge under normal *Chevron* standards, despite the existence of clearly valid applications of the regulation .... Our own cases confirm that the normal *Chevron* test is not transformed into an even more lenient "no valid applications" test just because the attack is facial. We have on several occasions invalidated agency regulations challenged as facially inconsistent with governing statutes despite the presence of easily imaginable valid applications. *See, e.g., Health Ins. Ass'n of America, Inc. v. Shalala*, 23 F.3d 412, 418–20 (D.C.Cir.1994).

*Nat'l Mining Ass'n v. U.S. Corps of Engineers*, 145 F.3d 1399, 1407–08 (D.C.Cir. 1998). *Corps of Engineers* quite clearly supports plaintiffs' position. The validity of that ruling is in doubt, however.

Recently, in *Amfac Resorts, L.L.C. v. U.S. Department of Interior*, 282 F.3d 818 (D.C.Cir.2002), *rev'd on other grounds, sub nom. Nat'l Park Hospitality Ass'n v. Dep't of Interior*, — U.S. —, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003), the D.C. Circuit recognized a potential problem with its ruling in *Corps of Engineers*. Specifically, the court stated that *Corps of Engineers'* examination of Supreme Court precedent "apparently overlooked" a 1993 Supreme Court case, *Reno v. Flores*, 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). *Amfac*, 282 F.3d at 826.

In *Reno v. Flores,* a class of alien juveniles, arrested on suspicion of being deportable and then detained pending deportation hearings, claimed that a regulation preventing their release except to close relatives violated the Due Process Clause and conflicted with the underlying statute. The Supreme Court described the case as involving only a facial challenge to the regulation and then held as follows:

> To prevail in such a facial challenge, respondents "must establish that no set of circumstances exists under which the [regulation] would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). That is true as to both the constitutional challenges, *see Schall v. Martin,* 467 U.S. 253, 268, n. 18, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), and the statutory challenge, *see* [*INS v. Nat'l Ctr. for Immigrants' Rights,* 502 U.S. 183 at 188, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991) ].

*Flores,* 507 U.S. at 301, 113 S.Ct. 1439. Thus, *Reno* seems to suggest that a plaintiff, challenging a regulation's validity as facially incompatible with statutory law, must show that "no set of circumstances" exists under which the regulation may be sustained.

*Amfac*'s recognition of the D.C. Circuit's apparent error did not resolve the matter, however, and confusion in this Circuit remains. *Cf. Nat'l Mining Ass'n v. U.S. Dep't of Interior,* 251 F.3d 1007, 1010 (D.C.Cir.2001) (comparing the application of the *Salerno* standard in several Supreme Court cases and a D.C. Circuit case with *Corps of Engineers* and leaving the question of whether "a law valid in some of its applications cannot be struck down as invalid on its face ... to another day"). Indeed, the D.C. Circuit is not alone; other courts have also wrestled with the *Salerno* standard, with only limited success. *See, e.g., A Woman's Choice–East Side Women's Clinic v. Newman,* 305 F.3d 684, 687 (7th Cir.2002) (providing that the Supreme Court's inconsistent utilization of the *Salerno* standard puts "courts of appeals in a pickle" and, as a result, declining to rely on *Salerno's* no-set-of-circumstances test); *S.D. Myers, Inc. v. City of San Francisco,* 253 F.3d 461, 467–68 (9th Cir.2001); *United States v. Frandsen,* 212 F.3d 1231, 1236 n. 3 (11th Cir.2000); *Fla. League of Prof'l Lobbyists, Inc. v. Meggs,* 87 F.3d 457, 459 (11th Cir.1996).

Even the Supreme Court's application of *Salerno* has been spotty, at best. *See, e.g., Janklow v. Planned Parenthood Sioux Falls Clinic,* 517 U.S. 1174, 1175–76, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (Stevens, J., mem. opinion denying cert.) (stating that "*Salerno*'s rigid and unwise dictum has been properly ignored in subsequent cases" and listing examples of such cases); *see also City of Chicago v. Morales,* 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Stevens, J., plurality opinion) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation which has never been the decisive factor in any decision of this Court, including *Salerno* itself ...."); *Washington v. Glucksberg,* 521 U.S. 702, 740, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring) ("I do not believe the Court has ever actually applied such a strict standard [as no-set-of-circumstances], even in *Salerno* itself, and the Court does not appear to apply *Salerno* here.").

Consequently, this court is left with little to guide it. While the D.C. Circuit has explicitly invoked the *Salerno* standard while evaluating constitutional challenges, *see, e.g., State of Nebraska v. EPA,* 331 F.3d 995, 999 n. 2 (D.C.Cir.2003); *Amfac,* 282 F.3d at 826 ("For our part, we have invoked *Salerno's* no-set-of-circumstances test to reject facial constitutional challenges."), neither the Supreme Court nor

the D.C. Circuit has consistently utilized the *Salerno* standard to review statutory challenges to administrative rules.[14] Thus, based upon the uneven application of the no-set-of-circumstances test, the confusion surrounding the doctrine, and this court's own view that *Chevron* is adequately deferential to the decisions of administrative agencies, the court declines to rely upon *Salerno* here. The court's decision is not outcome determinative, however, because, for reasons set forth more fully below, plaintiffs' primary challenge must fail, even when analyzed under the more traditional *Chevron* framework.

## III. ANALYSIS

As noted above, plaintiffs' essential argument is that the 2001 Regulations run contrary to key provisions of FLPMA. They contend that the 2001 Regulations suffer from three main deficiencies. First and foremost, plaintiffs argue that the 2001 Regulations fail to meet BLM's statutory mandate to "take any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. § 1732(b). Plaintiffs argue that in promulgating the 2001 Regulations, BLM essentially abdicated its duty to prevent "undue degradation" and instead, revised its definition of "unnecessary or undue degradation" to limit its authority to prevent only operations that are "unnecessary" for mining. Plaintiffs maintain that by reading "undue degradation" as superfluous to the statute, defendants contravene the plain language of FLPMA, in violation of the APA.

Second, plaintiffs contend that the 2001 Regulations fail to apply the additional FLPMA requirements to mining operations proposed on invalidly claimed or unclaimed lands. That is, according to plaintiffs, FLPMA's UUD standard is a floor, not a ceiling, and therefore applies primarily to mining operations conducted on valid mining claims, held pursuant to the General Mining Law of 1872. Plaintiffs contend that FLPMA subjects mining operations on land unencumbered by a valid mining claims to additional regulation. Plaintiffs assert that on these types of lands, the BLM is to: (1) manage the land in accordance with the principles of multiple use and sustained yield; (2) guard against permanent impairment; and (3) ensure the receipt of fair market value for a miner's use thereon. Plaintiffs challenge the 2001 Regulations' alleged failure to effectuate these more stringent requirements.

Third and finally, plaintiffs challenge the 2001 Regulations' failure to provide for public review of smaller mining exploration operations. Specifically, according to plaintiffs, the 2001 Regulations arbitrarily and improperly exempt mining exploration operations under five acres from submitting plans of operations or undergoing public review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* (2000).

In response to plaintiffs' claims, Interior offers three essential arguments. First, Interior asserts that the 2000 and 2001 Regulations are not as different from one another as plaintiffs contend. Interior maintains that "[t]he only change between the 2000 and 2001 rules in Interior's definition of UUD is the elimination of the provision defining UUD as 'substantial irreparable harm to significant scientific, cultural, or environmental resource values' because Interior determined the SIH proviso was contrary to statutory authority,

---

**14.** *But see Ruggiero v. FCC*, 317 F.3d 239, 249 (D.C.Cir.2003) (applying the no-set-of-circumstances test to a regulation but neither explaining the rationale for the application nor distinguishing among the different types of challenges in previous cases that were relied upon).

subjective, potentially cumulative, and overbroad." Def.'s Mot. for Summ. J. at 13. Second, Interior argues that no party in these rulemakings ever identified or defined the harm ostensibly prevented by the 2000 Regulations' SIH proviso. And third, Interior maintains that, in this case, plaintiffs espouse mere policy preferences for less or no mining on the public lands, untethered to the requirements of FLPMA or the Mining Law. Each claim will be explored in turn.

## A. Interior's Duty to Prevent Unnecessary or Undue Degradation of the Public Lands

 FLPMA mandates that the Secretary of the Interior "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. § 1732(b). The proper interpretation of this statutory mandate is the question now before this court.

### 1. Interior Must Prevent Both "Undue Degradation" and "Unnecessary Degradation" to the Public Lands.

The 2000 Regulations explicitly adopted the view that Congress had authorized the Secretary to prohibit mining activities found unduly degrading, although potentially lucrative. *See* Pls.' Mot. for Prelim. Inj. Ex. 1 at 16 (*Nat'l Mining Ass'n v. Babbitt*, Civ. No. 00–2998, Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.). This view was succinctly expressed in the preamble to the 2000 Regulations, which states:

> Congress did not define the term "unnecessary or undue degradation," but it is clear from the use of the conjunction "or" that the Secretary has the authority to prevent "degradation" that is necessary to mining, but undue or excessive. This includes the authority to disapprove plans of operations that would

cause undue or excessive harm to the public lands.

65 Fed.Reg. 69,998 (Nov. 21, 2000).

Interior's interpretation of FLPMA's UUD standard potentially changed in 2001, however. Before the 2001 Regulations were promulgated, Interior's Solicitor, William G. Myers III, wrote an opinion in which he reviewed the meaning of the words "unnecessary" and "undue," as well as FLPMA's legislative history. Based on this analysis, Solicitor Meyers determined that the terms "unnecessary" and "undue" were not two distinct statutory mandates, as the 2000 Regulations presumed, but were instead "two closely related subsets or equivalents." Def.'s Mot. for Summ. J. at 21; *see* Defs.' Ex. H at 2, 9 (Solicitor's Opinion) (finding that "unnecessary" and "undue" "may be reasonably viewed as similar terms (the second term defining the first) or as equivalents").

Based on this interpretation of the UUD standard, Solicitor Meyers determined that as long as a proposed mining activity is "necessary to mining," the BLM has no authority to prevent it. *Id.* at 14 ("FLPMA amends the Mining Law only as provided in four limited ways, and preventing necessary and due degradation is not one of them."). Solicitor Meyers found that:

> A definition that is more restrictive-that prevents degradation that would be caused by an operator who is using accepted and proper procedures in accordance with applicable federal and state laws and regulations when such degradation is required to develop a valuable mineral deposit-would inappropriately amend the Mining Law and impair the rights of the locator.

*Id.* at 12; *see* 66 Fed.Reg. 54,834, 54,837 (Oct. 30, 2001). Accordingly, Solicitor Meyers provided that the 2000 Regulations' SIH standard could not be sustained;

BLM could *not* disapprove of an otherwise allowable mining operation merely because such an operation would cause "substantial irreparable harm" to the public lands. The Solicitor thus concluded that "relevant legal authorities require removal of the 'substantial irreparable harm' criterion from both the definition of 'unnecessary or undue degradation' in § 3809.5 and the list of reasons why BLM may disapprove a plan of operations in § 3809.411(d)(3)(iii) of the 2000 regulations, 65 Fed.Reg. 69,998, 70,115, 70,121 through the rulemaking process currently underway within the Department." *Id.* at 15.

Plaintiffs challenge the Solicitor's interpretation and argue that, based upon FLPMA's statutory language, it is clear that Congress intended to prevent "unnecessary degradation" *as well as* "undue degradation." Thus, according to plaintiffs, under FLPMA "BLM must prevent undue degradation, even though the cause of the degradation may be necessary for mining." Pls.' Mot. for Summ. J. at 18.

Upon careful consideration, the court agrees with plaintiffs' view. The court finds that the Solicitor misconstrued the clear mandate of FLPMA. FLPMA, by its plain terms, vests the Secretary of the Interior with the authority-and indeed the obligation-to disapprove of an otherwise permissible mining operation because the operation, though necessary for mining, would unduly harm or degrade the public land.

■ Three well-established canons of statutory construction compel the court's conclusion. First, it is well settled that the language of the statute should govern. As stated by the Supreme Court: "The starting point in interpreting a statute is its language, for 'if the intent of Congress is clear, that is the end of the matter.'" *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) (quoting *Chevron,* 467 U.S. at

842, 104 S.Ct. 2778); *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (noting that the plain meaning of legislation should be conclusive, except in the "rare cases in which literal application of a statute will produce a result demonstrably at odds with the intention of its drafters"); *see also United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

■ The second rule is that when construing a statute, the court is "obliged to give effect, if possible, to every word Congress used." *Murphy Exploration & Prod. Co. v. U.S. Dep't of Interior,* 252 F.3d 473, 481 (D.C.Cir.2001) (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (citing *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955))). The court should "disfavor interpretations of statutes that render language superfluous." *See United States v. DBB, Inc.,* 180 F.3d 1277, 1285 (11th Cir.1999) (internal quotations and citation omitted).

■ Third and finally, it is clearly established that "[i]n statutory construction the word 'or' is to be given its normal disjunctive meaning unless such a construction renders the provision in question repugnant to other provisions of the statute," *In re Rice,* 165 F.2d 617, 619 n. 3 (D.C.Cir.1947) (citing *Gay Union Corp. v. Wallace,* 112 F.2d 192, 198 n. 15 (D.C.Cir. 1940)), or "the context dictates otherwise," *Reiter,* 442 U.S. at 339, 99 S.Ct. 2326. *See In re Espy,* 80 F.3d 501, 505 (D.C.Cir. 1996) ("[A] statute written in the disjunctive is generally construed as 'setting out separate and distinct alternatives.'") (quoting *United States v. Behnezhad,* 907 F.2d 896, 898 (9th Cir.1990)); *United States v. Lawrence,* 915 F.2d 402, 407 (8th Cir.1990); *United States v. Moore,* 613 F.2d 1029, 1039 (D.C.Cir.1979) ("Normally, of course, 'or' is to be accepted for its

disjunctive connotation, and not as a word interchangeable with 'and.' ") (citations omitted).

Applying these well-established canons to the matter at hand, FLPMA provides that the Secretary "shall by regulation or otherwise, take any action necessary to prevent unnecessary *or* undue degradation of the lands." 43 U.S.C. § 1732(b) (emphasis added). Accordingly, in this case: (1) the disjunctive is used, (2) the disjunctive interpretation is neither "at odds" with the intention of the FLPMA's drafters,[15] *Griffin*, 458 U.S. at 571, 102 S.Ct. 3245; *accord Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990), nor contrary to the statute's legislative history;[16] and (3) the "or" separates two terms that have different meanings.[17] Consequently, the court

finds that in enacting FLPMA, Congress's intent was clear: Interior is to prevent, not only unnecessary degradation, but also degradation that, while necessary to mining, is undue or excessive.

**2. Plaintiffs Have Not Shown that the 2001 Regulations Fail to Prevent Unnecessary or Undue Degradation.**

■ With that resolved, the question now before this court is whether the 2001 Regulations effectuate that statutory requirement. *See Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."). Put another way, the court must deter-

**15.** As recently noted by a sister court, through the UUD standard, Congress meant to balance mineral production with "the need to manage the public lands 'in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values.' " *Northwest Mining Ass'n*, 5 F.Supp.2d at 11 (quoting 43 U.S.C. § 1701(a)(8)).

**16.** NMA attempts to escape this conclusion by reference to FLPMA's legislative history. Toward this end, NMA points to FLPMA's Conference Report, which describes the "unnecessary or undue degradation provision" as "giving the Secretary of the Interior general authority to prevent needless degradation of the public lands." H.R. Conf. Rep. No. 94-1724, at 58 (1976), 1976 U.S.Code Cong. & Admin.News, 1976, pp. 6227, 6230. NMA argues that, rather than describing the "unnecessary or undue degradation" standard as pertaining to two distinct forms of degradation prevention, Congress chose only one word: "needless." NMA's Mot. for Summ. J. at 27. Thus, according to NMA, only one unitary standard was intended.

The court is not swayed by this argument. First, the word "needless" was not in clear reference to the provision at hand. Second, when the statute's words are clear, as the

word "or" is here, undue reliance on a statute's legislative history is disfavored. *See, e.g., United States v. $8,221,877.16 in United States Currency*, 330 F.3d 141, 160 (3d Cir. 2003) ("We will not wade into the depths of legislative history when the surface of the statute is clear and its meaning apparent."); *Phillip v. Univ. of Rochester*, 316 F.3d 291, 297 (2d Cir.2003) ("If a statute is clear on its face, a court is not permitted to use other interpretive tools, including legislative history, to discern the statute's meaning."); *United States v. Braxtonbrown–Smith*, 278 F.3d 1348, 1352 (D.C.Cir.2002); *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir.2000) (*en banc* ), *cert. denied*, 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001). Finally, even if the court were inclined to rely on FLPMA's legislative history, after conducting its own in-depth analysis, the court finds that FLPMA's legislative history is relatively unilluminating. The court thus agrees with Solicitor Meyers who found that "FLPMA's legislative history is unavailing." Defs.' Ex. H at 8 (Solicitor's Opinion).

**17.** "A reasonable interpretation of the word 'unnecessary' is that which is not necessary for mining. 'Undue' is that which is excessive, improper, immoderate, or unwarranted." *Utah v. Andrus*, 486 F.Supp. 995, 1005 n. 13 (D.Utah 1979).

mine whether the 2001 Regulations reasonably interpret and implement FLPMA, as properly understood. *Id.* at 843, 104 S.Ct. 2778.

Plaintiffs contend that the 2001 Regulations ignore FLPMA's "undue" language and essentially limit BLM's authority to prevent only surface disturbance greater than necessary. Plaintiffs insist that "if an activity such as locating a waste dump on top of a Native American sacred site or dewatering an entire drinking water aquifer is 'necessary for mining,' and the mining company pledged to meet a few technical requirements, the BLM would be powerless to protect those resources." Pls.' Mot. for Summ. J. at 19; *see also id.* at 30.

Interior, on the other hand, maintains that, despite the elimination of the 2000 Regulations' SIH standard, and the Solicitor's understanding that the terms "undue" and "unnecessary" "overlap in many ways," the 2001 Regulations nevertheless prevent UUD, as properly defined by this court. Defs.' Mot. for Summ. J. at 22, 29 (arguing that the 2001 Regulations "will prevent all UUD, including UUD occasioning 'irreparable harm to scientific, cultural, or environmental resource values' "); Defs.' Reply at 5 (arguing that "both types of degradation are prevented"); *see also* 66 Fed.Reg. 54,834, 54,838 (Oct. 30, 2001) ("BLM does not need an SIH standard in its rules either to protect against unnecessary degradation or to protect against undue degradation .... BLM has other statutory and regulatory means of preventing irreparable harm to significant scientific, cultural, or environmental resource values."); *id* at 54,841 ("We understand it is our responsibility to implement FLPMA and prevent unnecessary or undue degradation.").

Specifically, Interior argues that it will protect the public lands from any UUD by exercising case-by-case discretion to protect the environment through the process of: (1) approving or rejecting individual mining plans of operations; (2) regulating in response to the requisite Notices that operators must submit before commencing exploration activities not requiring a plan of operations; (3) requiring financial guarantees for costs for mining activities; and (4) linking performance standards to those set forth in existing laws and regulations. These existing laws and regulations include: the Endangered Species Act, 16 U.S.C. §§ 1531–1534 (2000); the Archeological Resources and Protection Act, 16 U.S.C. §§ 470aa–470mm (2000); the Clean Water Act, 33 U.S.C. §§ 1251–1387 (2000); the Comprehensive Environmental Response, Control and Liability Act, 42 U.S.C. §§ 9601–9675 (2000); Interior's authority under FLPMA to withdraw public land from mining entry, 43 U.S.C. § 1714; and Interior's authority under FLPMA to formally designate and withdraw from mining "areas of critical environmental concern," 43 U.S.C. § 1712(c)(3). Defs.' Mot. for Summ. J. at 16 (citing Defs.' Ex. A at 68–69, 93–97, 117–118, 120–23 (NRC Report)); *see also* 43 C.F.R. §§ 3809.5, 3809.411, 3809.420 (2003).

Plaintiffs, in response, have been unable to present evidence to contradict or undermine Interior's claim. Plaintiffs have not shown that, by the exercise of case-by-case discretion, Interior will fail to prevent unnecessary or undue degradation.

The court thus finds that, in promulgating FLPMA, Congress tasked the Secretary of Interior with preventing both "unnecessary" as well as "undue" degradation to the public lands. The court finds further, however, that the terms "unnecessary" and "undue," which are not defined in the FLPMA, are themselves ambiguous. *Cf.* Defs.' Ex. H at 3 (Solicitor's Opinion). In tasking the Secretary to prevent "unnecessary or undue" degradation, Congress left two broad gaps for the Secretary

to fill, which the Secretary has elected to fill through the exercise of her discretion, on a case-by-case basis. *Cf.* 66 Fed.Reg. at 54,838.

Because FLPMA is silent or ambiguous with respect to what specifically constitutes "unnecessary or undue degradation," and the means Interior should take to prevent it, the court shall review Interior's actions under the second prong of *Chevron*. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778; *see also Christensen v. Harris County*, 529 U.S. 576, 586–87, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Consequently, the court must determine, not whether the 2001 Regulations represent

the best interpretation of the FLPMA, but whether they represent a reasonable one. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. Here, upon careful consideration, the court finds that they do. Plaintiffs have neither demonstrated that the 2001 Regulations fail to prevent unnecessary or undue degradation of the public lands, in contravention of FLPMA, nor that Interior, in promulgating the 2001 Regulations, toiled under an erroneous view of its own authority.[18] The 2001 Regulations are neither "procedurally defective" nor "arbitrary or capricious in substance," nor "manifestly contrary" to the FLPMA. *United States v. Mead Corp.*, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292

---

**18.** While the Solicitor's opinion would tend to undermine this claim, and the question is indeed extremely close, the court finds that Interior's decision to promulgate the 2001 Regulations and abolish the SIH standard, while influenced by the Solicitor's (erroneous) opinion concerning the illegality of the SIH standard, was not based *primarily* upon it. *Cf. Sea–Land Service, Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C.Cir.1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.' ") (quoting *Prill v. NLRB*, 755 F.2d 941, 947 (D.C.Cir. 1985)).

In reaching this conclusion, the court relies primarily on the following statement: "Regardless of whether this [SIH] provision was legally promulgated in the 2000 rule, BLM has determined that we should remove the provision, since other means exist to protect the resources covered by the SIH standard." 66 Fed.Reg. at 54,838; *see also id.* at 54,837, 54,846, 54,849; Defs.' Statement of Material Facts ¶ 22 ("The 2001 Solicitor's Opinion ... was one basis, among many, for the 2001 rule."); Defs.' Mot. for Summ. J. at 12 (providing that Interior decided to abolish the SIH proviso because of: "(1) Interior's failure during the 2000 rulemaking to notify the public that the SIH proviso as written would actually be included in the 2000 rule as new text"; "(2) concerns by Western states that the 2000 rule would lead to a substantial decrease in mining activity, causing serious economic consequences; and (3) questions

about whether Interior had sufficient statutory authority to adopt the SIH proviso and whether it could prevent UUD without that proviso"); Defs.' Reply at 11 (providing that Interior rescinded the SIH proviso because a narrower definition would prevent all harm prevented by the broader rule "without the unnecessary costs and harm occasioned by the 2000 rule's regulatory overbreadth").

The above statements tend to demonstrate that Interior abolished the SIH standard in the exercise of its own judgment, not merely because, based on the Solicitor's opinion, it believed it "had no choice." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 819 (D.C.Cir. 2002) (noting that a court should ask whether the agency "voluntarily acquiesced" to an erroneous legal standard because, in the exercise of its own discretion, it believed the standard to be reasonable, or, alternatively, acquiesced because it "believed that it had no choice"). *But see* Pls.' Stmt. of Mat. Facts, ¶ 22 ("[T]he removal of the SIH standard in the 2001 Regulations was based in large part on the [Solicitor's Opinion]."); NMA Statement of Material Facts ¶ 27 ("BLM relied upon the 2001 Solicitor's Opinion and removed the 'mine veto' authority from the Subpart 3809 regulations, recognizing that the authority was both illegal and would have adverse impacts to the domestic mining industry."); NMA's Mot. for Summ. J. at 13 ("In 2001, BLM reevaluated and removed the 'mine veto' (SIH) provision concluding it exceeded the agency's authority ....").

(2001). Thus, the regulations must be accorded due deference. *See Christensen,* 529 U.S. at 587, 120 S.Ct. 1655; *Shalala v. Ill. Council on Long Term Care, Inc.,* 529 U.S. 1, 19, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000); *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.,* 503 U.S. 407, 417, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992) ("Judicial deference to reasonable interpretations by an agency of a statute that it administers is a dominant, well-settled principle of federal law."). Accordingly, the first of plaintiffs' challenges must fail.

## B. Mining Operations Proposed on Invalidly Claimed or Unclaimed Lands

The court now turns to the second of plaintiffs' three claims. The Mining Law of 1872, 30 U.S.C. §§ 21–47 (2000), distinguishes between claimed and unclaimed land, affording greater rights to those who hold a valid mining claim.[19] Based on this distinction, plaintiffs contend that the FLPMA gives BLM enhanced oversight on lands unencumbered by a valid mining claim-that operations thereon are subject, not only to the baseline UUD standard, but also to the "full panoply" of BLM's regulatory power. Pls.' Mot. for Summ. J.

at 32. According to plaintiffs, BLM must therefore: (1) manage these lands on the basis of multiple use and sustained yield; (2) prevent permanent impairment of public lands; and (3) ensure the receipt of fair market value for a company's use thereon. Plaintiffs maintain that: "BLM's failure to implement the entire set of FLPMA requirements ... on invalidly claimed or wholly unclaimed public lands is not based on any reasonable interpretation of [FLPMA] and cannot withstand judicial review." *Id.* at 12.

NMA advances two primary arguments in defense of the 2001 Regulations. First, NMA argues that, because essentially the same rules have governed unclaimed or invalidly claimed land since 1980, the relevant provisions in the 2001 Regulations are entitled to substantial deference. NMA's Mot. for Summ. J. at 35. Second, NMA contends that the 2001 Regulations properly limit Interior's authority over mining to the UUD standard, even on unclaimed land. *Id.* at 32, 37. NMA asserts that this question boils down to one of mining claim validity and that such questions are beyond the reach of § 3809.

Interior also defends the 2001 Regulations, but on a very different ground.[20]

---

**19.** The Mining Law gives individuals the right to explore for mineral resources on lands that are "free and open" in advance of having made a "discovery" or perfected a valid mining claim. *United States v. Locke,* 471 U.S. 84, 86, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985). The Mining Law provides, however, that a mining claim cannot be perfected "until the discovery of the vein or lode." 30 U.S.C. § 23; *see also Cole v. Ralph,* 252 U.S. 286, 295–96, 40 S.Ct. 321, 64 L.Ed. 567 (1920); *Locke,* 471 U.S. at 84, 105 S.Ct. 1785 (stating that discovery is required for valid location); *Waskey v. Hammer,* 223 U.S. 85, 90, 32 S.Ct. 187, 56 L.Ed. 359 (1912) (stating that discovery is "a prerequisite to the location of the claim"); *Am. Colloid Co. v. Babbitt,* 145 F.3d 1152, 1156 (10th Cir.1998) ("Before one may obtain any rights in a mining claim, one must

'locate' a valuable deposit of a mineral."); Defs.' Mot. for Summ. J. at 3 (same).

**20.** Interior also appears to argue that, because unclaimed land has been governed by essentially the same regulatory scheme since 1980, plaintiffs' challenge is time-barred. *See* Defs.' Mot. for Summ. J. at 33 (noting that plaintiffs "should have raised this claim in 1980, or otherwise within the statute of limitations applicable to the 1980 rule, not 21 years later"). Assuming that Interior is attempting to advance this argument here, the court finds that Interior's efforts are insufficient. Because Interior cites no authority nor offers any rhetorical support for its potential statute of limitations defense, it need not be considered here. *Cf. S.E.C. v. Banner Fund Int'l,* 211 F.3d 602, 613–14 (D.C.Cir.2000) (refusing to address an " 'asserted but unana-

Unlike NMA, Interior concedes that its regulatory power over unclaimed or invalidly claimed land is not limited to the UUD standard. Interior therefore recognizes that it has the discretion to choose other uses on unclaimed or inadequately claimed public land, to the exclusion of mining.[21] Interior argues, however, that the 2001 Regulations comport with this requirement because they give Interior the authority to regulate unclaimed lands "on a case-by-case" and "situation-specific" basis. Defs.' Mot for Summ. J. at 35, 36. Interior's essential argument, then, is that plaintiffs' challenge must fail because, in practice, Interior already complies with all the requirements plaintiffs urge.

### 1. Distinction Between Claimed and Unclaimed Lands

In order to parse these conflicting claims, the court must first explore the Mining Law, and the rights conferred thereunder. As noted above, the Mining Law provides: "Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States ... are hereby declared to be free and open to exploration and purchase ... under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts ...." 30 U.S.C. § 22.

In practice, the Mining Law gives citizens three primary rights: (1) the right to explore for valuable mineral deposits, 30 U.S.C. § 22; (2) the right to possess, occupy, and extract minerals from the lands in which valuable mineral deposits are found, 30 U.S.C. § 26; and (3) the right to patent lands in which valuable mineral deposits are found, 30 U.S.C. § 29. In addition to these primary rights, the Mining Law, in tandem with FLPMA, vests individuals with the following subordinate rights: (1) the right to ingress and egress to and from valid mining claims, 43 U.S.C. § 1732(b); and (2) the right to locate up to five acres of nonmineral land for mill site[22] use in association with each valid mining claim, 30 U.S.C. § 42. The latter two primary rights (possession and patent) and both subordinate rights (ingress/egress and mill site use) are premised upon the perfection of a valid mining claim, which, as noted above, requires the making of a "discovery," as well as posting, recordation, payment of annual fees, and compliance with other applicable statutory and regulatory requirements. 30 U.S.C.A. §§ 28, 28f (2003); *Locke*, 471 U.S. at 86, 105 S.Ct. 1785.

While a claimant can explore for valuable mineral deposits before perfecting a valid mining claim, without such a claim,

---

lyzed' argument") (quoting *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983)).

**21.** Interior states that its "position on this issue was expressly set forth as follows in the Federal Register preamble to the 2000 rule, which continues under the 2001 rule." In the 2000 preamble, Interior states the following:

It must be clearly understood, however, that persons who conduct operations on lands without valid claims or mill sites do not have the same rights associated with valid claims or sites. This means that BLM's decision whether to approve such mining activities ... is not constrained or limited by whatever rights a mining claimant or mill site locator may have, and thus

is of a somewhat different and more discretionary character than its decision where properly located and maintained mining claims are involved. For example, an operator [who] doesn't have a properly located or perfected mill site would not be able to rely upon a property right under the mining laws to place a tailings pile on unclaimed land. Such situations will be evaluated on a case-by-case basis in accordance with BLM policy.

65 Fed.Reg. 69,998, 70,047 (Nov. 21, 2000).

**22.** Mill sites support the extraction and processing of hardrock minerals. Mill sites may be located on "nonmineral land not contiguous to the vein or lode." 30 U.S.C. § 42.

she has no property rights against the United States (although she may establish rights against other potential claimants), and her use of the land may be circumscribed beyond the UUD standard because it is not explicitly protected by the Mining Law.[23] *See Cameron v. United States,* 252 U.S. 450, 460, 40 S.Ct. 410, 64 L.Ed. 659 (1920) (stating that "no right arises from an invalid claim of any kind"); *accord Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 337, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Cole v. Ralph,* 252 U.S. 286, 296, 40 S.Ct. 321, 64 L.Ed. 567 (1920); *United States v. Allen,* 578 F.2d 236, 238 (9th Cir.1978); *Clouser v. Madigan,* 1992 WL 694368, at *16 (D.Or. Dec.22, 1992); *Skaw v. United States,* 13 Cl.Ct. 7, 28 (1987), *aff'd,* 847 F.2d 842, 1988 WL 34099 (Fed. Cir.1988) (unpublished opinion) ("A mining claim does not create any rights against the United States and is not valid unless and until all requirements of the mining laws have been satisfied."); Pls.' Ex. 3 at 2, 7–8 (Solicitor's Ancillary Use Memorandum).

Before an operator perfects her claim, because there are no rights under the Mining Law that must be respected, BLM has wide discretion in deciding whether to approve or disapprove of a miner's proposed plan of operations. Accordingly, the system may be properly described in the following manner:

> When the Secretary considers a proposed plan of operations involving valid mining claims and valid mill sites, the Secretary must respect the rights that attach to these valid claims and mill sites while at the same time complying with the statutory mandate to "prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. § 1732(b) .... When reviewing a proposed plan of operations involving mining claims or mill sites that are not valid (or when unclaimed public lands are involved), however, the Secretary has broader discretion, because there are no rights under the Mining Law that must be respected.

Pls.' Ex. 3 at 11 (Solicitor's Ancillary Use Memorandum).[24]

Against this backdrop, the court must now consider BLM's implementation of the Mining Law and FLPMA. BLM provided in the 2001 Regulations:

> BLM has carefully considered the relationship between FLPMA and rights under the mining laws. In these regulations, BLM has decided that it will approve plans of operations on unclaimed land open under the mining laws if the requirements of subpart 3809 are satisfied, and the other considerations that attach to a Federal decision, such as Executive Order 13007 on Indian Sacred Sites, are also met.

65 Fed.Reg. at 70,013.

The question before this court, then, is whether this policy constitutes a reasonable exercise of BLM's discretion to implement FLPMA and the Mining Law. Before answering that broad question, however, the court will pause to consider plaintiffs' more specific challenges at issue here. The court will first analyze plaintiffs' challenge to Interior's enforcement of FLPMA's multiple use and sustained yield provision. The court will then consider

**23.** Prior to perfecting a valid mining claim, an operator working toward discovery is "protected against forcible, fraudulent, and clandestine intrusions upon his possession" by rival claimants, "at least for a reasonable time" under the doctrine of *pedis possessio.*

*Union Oil Co. v. Smith,* 249 U.S. 337, 346–47, 39 S.Ct. 308, 63 L.Ed. 635 (1919).

**24.** The court expressly rejects NMA's view that only the UUD standard may properly apply to all mining activities performed on public land.

FLPMA's permanent impairment provision. Finally, the court will review FLPMA's fair market value claim provision.

### a. Multiple use and sustained yield provision

■ FLPMA's "multiple use and sustained yield" provision provides as follows:

The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when they are available, except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law.

43 U.S.C. § 1732(a). Section 1712(c)(1), in turn, provides that "the Secretary shall ... use and observe the principles of multiple use and sustained yield set forth in this and other applicable law." 43 U.S.C. § 1712(c)(1).

Interior argues that the 2001 Regulations satisfy FLPMA's multiple use policies by expressly including a performance standard that all operations under § 3809 be managed in accordance with the applicable land use plans. Interior directs the court to § 3809.420(a)(3), which provides as follows:

Land use plans. Consistent with the mining laws, your operations and post-mining land use must comply with the applicable BLM land-use plans and activity plans, and with coastal management plans under 16 U.S.C. § 1451, as appropriate.

43 C.F.R. § 3809.420(a)(3). Relying on § 3809.420(a)(3), as well as the provisions set forth in BLM's Land Use Planning Handbook, Interior maintains that "when BLM receives a proposed plan of operations under the 2001 rules, pursuant to Section 3809.420(a)(3), it assures [sic] that

the proposed mining use conforms to the terms, conditions, and decisions of the applicable land use plan, in full compliance with FLPMA's land use planning and multiple use policies." Defs.' Mot. for Summ. J. at 35; *see also* Defs.' Reply at 19–20 ("Under 43 C.F.R. § 3809.411, a site-specific FLPMA multiple use analysis is performed at the time Interior reviews the proposed mining plan of operations for mining activities on unclaimed lands not authorized under the Mining Law, with safeguards to assure the adequacy of the review.").

Plaintiffs in no way respond to Interior's claims—nor do they demonstrate that Interior's procedure is so ineffective as to violate the APA. Accordingly, plaintiffs' multiple use, sustained yield claim must fail.

### b. Permanent impairment

Turning to plaintiffs' second claim, 43 U.S.C. § 1702(c) requires "management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources ...." 43 U.S.C. § 1702(c). Plaintiffs contend, in passing, that the 2001 Regulations fail to effectuate this statutory provision. Plaintiffs neglect to show how the 2001 Regulations fall short, however. Accordingly, plaintiffs have not satisfied their burden under the APA, and their "permanent impairment" challenge cannot be sustained.

### c. Fair market value claim provision

■ The court may now turn to plaintiffs' fair market value claim. FLPMA states that it is the policy of the United States to "receive fair market value of the use of the public lands and their resources unless otherwise provided for by statute." 43 U.S.C. § 1701(a)(9). Plaintiffs contend that only initial exploration activities and

subsequent legal uses on valid claims are exempt from this requirement. Therefore, according to plaintiffs, BLM must require fair market value for operations conducted on unclaimed or inadequately claimed land. Plaintiffs challenge the 2001 Regulations' failure to effectuate this statutory requirement.

Interior and NMA, meanwhile, maintain that plaintiffs' challenge lacks merit because by stating "unless otherwise provided for by statute," § 1701(a)(9) carves out a broad exception to the general fair market value requirement, which extends to mining operations on unclaimed lands. Defs.' Mot. for Summ. J. at 38–40; NMA Mot. for Summ. J. at 42–43. In the alternative, Interior contends, moreover, that 43 U.S.C. § 1701(a)(9) sets forth only a *policy goal*—not an express statutory mandate—and that, under FLPMA, Interior has wide discretion to balance competing policies. *See* Defs.' Mot. for Summ. J. at 39 (citing *Watt*, 696 F.2d at 738 (noting that § 1701(a) "requires Interior to recognize competing values")).

In response, plaintiffs note that the Mining Law does not vest operators on unclaimed or invalidly claimed land with legal rights against the United States. As such, according to plaintiffs, such persons are not affected by § 1701(a)(9)'s "carve out" provision, and *are* therefore subject to the general fair market value requirement at issue here.

The court finds more merit in plaintiffs' view. The court concludes that, for the reasons set forth above, if there is no valid claim and the claimant is doing more than engaging in initial exploration activities on lands open to location, the claimant's activity is not explicitly protected by the Mining Law or FLPMA. Thus, the activity does not fall within the carve-out provision set forth in § 1701(a)(9). Interior and NMA's arguments to the contrary are without merit.

Accordingly, the court shall turn to consider Interior's second, alternate argument: that requiring categorical fair market value payments for public lands not subject to a valid mining claim or otherwise protected by statute does not represent the only rational balancing of FLPMA's many values. Defs.' Mot. for Summ. J. at 39. As to this argument, the court agrees—but finds its assent to be of no moment. While it is true that in administering FLPMA, Interior is obligated to balance FLPMA's many values, and while it is also true that Interior's decision of how to balance the competing interests would *normally* be entitled to great deference, *Watt*, 696 F.2d at 738, such deference is not appropriate here.

Throughout its brief, Interior professes its understanding that Congress's policy goal does not apply to unclaimed lands. *See, e.g.,* Defs.' Mot. for Summ. J. at 38; *cf., Transitional Hosps. Corp. of La., Inc. v. Shalala*, 222 F.3d 1019, 1029 (D.C.Cir. 2000) (relying, in part, on an agency's brief to determine the agency's understanding); *see also* 65 Fed.Reg. at 70,013 (discussing Interior's policy as to unclaimed lands). Based on Interior's arguments to this court and the legislative record, it appears that Interior, in promulgating the 2001 Regulations, did not attempt to further Congress's policy goal of receiving "fair market value of the use of public lands and their resources," insofar as the regulations govern mining operations on unclaimed lands.

Because Interior balanced the various values set forth in FLPMA while operating under the erroneous assumption that it did not need to attempt to obtain fair market value for mining operations conducted on unclaimed land, the court finds that Interior's judgment is not entitled to deference—and cannot stand. *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct.

454, 87 L.Ed. 626 (1943) (stating that an "order may not stand if the agency has misconceived the law"); *see Mass. Trustees v. United States,* 377 U.S. 235, 248, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964) ("If a regulation is based on an incorrect view of applicable law," the regulation cannot stand as promulgated, unless the "mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached."); *Transitional Hosps. Corp.,* 222 F.3d 1019; *Sea–Land Serv., Inc. v. Dep't of Transp.,* 137 F.3d 640 (D.C.Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.' ") (quoting *Prill v. NLRB,* 755 F.2d 941 (D.C.Cir.1985)); *Phillips Petroleum Co. v. F.E.R.C.,* 792 F.2d 1165, 1169–70 (D.C.Cir.1986) ("When . . . the agency's decision is based on an erroneous view of the law, its decision cannot stand."); *Prill,* 755 F.2d 941 ("An agency decision cannot be sustained, however, where it is based not on the agency's own judgment but on an erroneous view of the law."); *Planned Parenthood Fed'n of Am., Inc. v. Heckler,* 712 F.2d 650, 666 (D.C.Cir.1983) (Bork, J., concurring in part, dissenting in part) ("If a regulation is based on an incorrect view of applicable law, the regulation cannot stand as promulgated, unless the 'mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached.' ") (quoting

*Mass. Trustees,* 377 U.S. at 248, 84 S.Ct. 1236); *EEX Corp. v. U.S. Dep't of Interior,* 111 F.Supp.2d 24 (D.D.C.2000); *accord Holland v. Nat'l Mining Ass'n,* 309 F.3d 808, 815–16 (D.C.Cir.2002).

Operations neither conducted pursuant to valid mining claims nor otherwise explicitly protected by FLPMA or the Mining Law (*i.e.,* exploration activities, ingress and egress, and limited utilization of mill sites) must be evaluated in light of Congress's expressed policy goal for the United States to "receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(9). Because, in promulgating 65 Fed.Reg. 70,013, Interior was not cognizant of its statutory obligation to attempt to "receive fair market value of the use of public lands and their resources," and did not balance its competing priorities with that obligation mind, the court finds that the regulations must be remanded to Interior, so that Congress's policy goal, as set forth in § 1701(a)(9), may be given proper effect. Judgment shall therefore be entered for plaintiffs on this claim.

## C. Smaller Mining Exploration Operations

The court now turns to plaintiffs' third and final claim. Here, plaintiffs challenge the 2001 Regulations' categorical exemption of exploration projects of less than five acres, often referred to as "Notice exploration projects," from requiring plans of operations and from review under NEPA.[25] Plaintiffs argue that small-scale

---

**25.** In passing, plaintiffs also contend that small-scale Notice mines should be forced to comply with the National Historic Preservation Act, 16 U.S.C. §§ 470 *et seq.* (2000), the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* (2000), the American Indian Religious Freedom Act, 42 U.S.C. § 1996 (2000), as well as the Memorandum issued by President Clinton on April 24, 1994, concerning Native American Tribal Governments, Government–

to–Government Relations with Native American Tribal Governments, 59 Fed.Reg. 22,951 (May 4, 1994). Because the court finds that plaintiffs' briefing inadequately addresses these claims, the court will not consider them here. *See United States v. Wade,* 992 F.Supp. 6, 21 (D.D.C.1997) (refusing to address an argument, briefly raised, but for which "absolutely no legal, factual, or rhetorical support" was offered); *cf. SEC v. Banner Fund Int'l,*

exploration projects have the potential to seriously damage environmental and cultural resources and contend that "[t]he record in this case is devoid of any evidence that the damage caused by 5–acre or less operations is inherently so minimal that the UUD standard is met in every instance, or that the damage ... is so minor that they would never trigger full NEPA ... review." Pls.' Mot. for Summ. J. at 40.

### 1. Plan of Operations

Plaintiffs' "plan of operations" claim merits only brief discussion. Quite simply, plaintiffs have failed to show that Interior's decision not to require a plan of operations for Notice exploration projects violates the FLPMA or is otherwise arbitrary or capricious. In reaching this decision, the court notes that the NRC Report recommends the distinction made by Interior between small-scale exploration projects and Plan-level operations (which do require the submission of a plan of operations). Defs.' Ex. A at 95 (NRC Report) ("Plans of operation should be required for mining and milling operations, other than those classified as casual use or exploration activities, even if the area disturbed is less than 5 acres."). In addition, Interior based the distinction on its own reasoned judgment. 66 Fed.Reg. 54,834, 54,846 (Oct. 30, 2001) ("The basis [for deciding whether a plan of operations should be required] is the level of harm likely to result from the activity, rather than its purpose or intended result, and so a distinction has been drawn between exploration activities and mining operations. Exploration generally has not created major environmental impacts, nor is it difficult to mitigate."). The court will not second guess Interior's judgment here.

### 2. NEPA

Plaintiffs' NEPA claim presents a somewhat closer question. As noted above, plaintiffs maintain that Notice exploration projects significantly affect the environment and therefore implicate NEPA. In response, Interior and NMA contend that BLM's decision to retain streamlined filing for Notice exploration projects is both a lawful and rational exercise of BLM's discretion. *See Sierra Club v. Penfold*, 857 F.2d 1307, 1311 (9th Cir.1988) (upholding five-acre threshold). In order to determine which view shall prevail, the court must first determine what, exactly, NEPA requires—and if it applies to the small-scale exploration projects at issue here.

#### a. Background information on NEPA

Under NEPA, all agencies of the federal government must "prepare a detailed environmental analysis for major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This environmental analysis, commonly known as an Environmental Impact Statement ("EIS"), is to include such considerations as "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. § 4332(C); *see Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 146 (D.C.Cir.1985).

The statute is procedural in nature. *Grand Council of Crees (of Quebec) v. F.E.R.C.*, 198 F.3d 950, 959 (D.C.Cir.2000). It " 'does not impose substantive duties mandating particular results, but simply prescribes the necessary process for preventing uninformed—rather than unwise— agency action.' " *Id.* (quoting *Robertson v.*

---

211 F.3d 602, 613–14 (D.C.Cir.2000) (refusing to address an " 'asserted but unanalyzed' ar-

gument") (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983)).

*Methow Valley Citizens Council,* 490 U.S. 332, 333, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)); *see also Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("NEPA does not work by mandating that agencies achieve particular substantive results."). The EIS thus serves two purposes: it "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson,* 490 U.S. at 349, 109 S.Ct. 1835; *accord Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (noting that NEPA ensures that federal decision-makers take a "hard look" at the environmental implications of their actions); *Citizens Against Rails–to–Trails v. Surface Transp. Bd.,* 267 F.3d 1144, 1151 (D.C.Cir.2001) (quoting *Macht v. Skinner,* 916 F.2d 13, 18 (D.C.Cir.1990)); *Grand Council of Crees,* 198 F.3d at 959.

As the statutory language indicates, however, "the duty to prepare an EIS is triggered only by a proposal for 'major Federal action significantly affecting the quality of the human environment.'" *Edmonds Inst. v. Babbitt,* 42 F.Supp.2d 1, 18 (D.D.C.1999) (quoting *Fund for Animals v. Thomas,* 127 F.3d 80, 83 (D.C.Cir. 1997)).[26] The relevant inquiry thus turns on whether Notice exploration projects are "major Federal actions" within NEPA's statutory scope.[27]

In this case, Interior has apparently determined that Notice projects do not constitute "major Federal actions."[28] *See* 66

---

**26.** Should an agency initially determine that there is a major Federal action but that the major action does not have a "significant impact" on the environment, the agency must support that finding with a "concise public document" called an "environmental assessment." 40 C.F.R. § 1501.4; *accord Found. on Econ. Trends,* 756 F.2d at 147. If the environmental assessment confirms that the action does not have a "significant impact" on the environment, the agency must issue a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1508.13.

**27.** Plaintiffs assert that "NEPA applies to *all* federal actions that have a material environmental impact." Pls.' Mot. for Summ. J. at 41; *id.* ("While it is true that a full Environmental Impact Statement (EIS) is only required for 'major' actions ... NEPA applies to all federal actions."). In so arguing, plaintiffs apparently confuse the "major Federal action" prong of the NEPA inquiry with the "significantly affects the environment" prong of the NEPA inquiry. In fact, as made clear above, in reviewing NEPA decisions, the court must "make the 'threshold determination' whether there is a major federal action." *Save Courthouse Comm. v. Lynn,* 408 F.Supp. 1323, 1341 (S.D.N.Y.1975); *see also Citizens*

*Against Rails–to–Trails,* 267 F.3d at 1151 ("[T]he threshold legal question [is] whether an action falls within NEPA in the first place."). If there is no "major Federal action," that is the end of the inquiry; the agency need not prepare an EIS. *Citizens Against Rails–to–Trails,* 267 F.3d at 1151; *Save Barton Creek Ass'n v. Fed. Highway Admin.,* 950 F.2d 1129, 1133 (5th Cir.1992) ("The requirements of NEPA, which include, among other things, the submission of an EIS, apply only when the federal government's involvement in a project is sufficient to constitute 'major Federal action.'"); *Sugarloaf Citizens Ass'n v. F.E.R.C.,* 959 F.2d 508, 512 (4th Cir.1992) ("Only proposals for a 'major' federal action therefore require review by an agency under NEPA."); *Penfold,* 857 F.2d at 1313 ("NEPA compliance is required only where there is a 'major Federal action' which significantly affects the environment").

**28.** Confusingly, Interior provides that "[p]laintiffs have not shown this Court any words in the 2001 rule or elsewhere in the administrative record in which Interior determines that exploration activities are exempt from NEPA or its implementing regulations ...." Defs.' Mot. for Summ. J. at 42. No-

Fed.Reg. at 54,846–47 (noting that, for activities affecting less than five acres, "[e]xploration generally has not created major environmental impacts, nor is it difficult to mitigate."). Interior's NEPA determination "is not entitled to the deference that courts must accord to an agency's interpretation of its governing statute" and is instead "a question of law, subject to de novo review." *Citizens Against Rails–to–Trails*, 267 F.3d at 1150–51; *see Grand Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C.Cir.2002).

### b. "Major Federal Action"

The court must thus determine whether Interior was reasonable in finding that Notice exploration projects are not "major Federal actions" within the meaning of NEPA. In so doing, the court must wade into cloudy waters. "[N]o litmus test exists to determine what constitutes 'major Federal action,'" *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1134 (5th Cir.1992), and "[f]ederal courts have not agreed on the amount of federal involvement necessary to trigger the applicability of NEPA," *Village of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1480 (10th Cir.1990). While the lines are thus murky, a few things are clear.

In determining what constitutes a "major Federal action," the court may first look to the regulations implementing NEPA. *Penfold*, 857 F.2d at 1312 n. 9 ("The regulations are binding on all federal agencies and provide guidance to courts for interpreting NEPA requirements.");

*see, e.g., Town of Cave Creek v. FAA*, 325 F.3d 320, 327–28 (D.C.Cir.2003) (citing relevant regulations for explanation of NEPA); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 662 (D.C.Cir.1996) (relying on implementing regulations for interpretation of NEPA).

The relevant regulation, 40 C.F.R. § 1508.18, provides that "'[m]ajor Federal action' includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. The regulation goes on to state: "Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies .... Actions do not include bringing judicial or administrative civil or criminal enforcement actions." *Id.* § 1508.18(a). The regulations then set forth a few broad categories, which usually involve major Federal actions. One such category includes: "Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." *Id.* § 1508.18(b)(4).

▆▆▆▆ Based on 40 C.F.R. § 1508.18, as well as the voluminous case law interpreting NEPA's requirements, a few trends emerge. To determine whether an action is or is not a "major Federal action" within the meaning of 42 U.S.C. § 4332(C), the court shall consider the following factors: (1) whether the project is federal or non-federal;[29] (2) whether the project re-

where, however, does Interior specifically contradict plaintiffs' assertion that the 2001 Regulations exclude Notice exploration projects from NEPA review, by suggesting, for instance, that it would perform, or has performed, a NEPA review on exploration activities of less than five acres. Interior's argument is further undermined by the fact that, in other briefs filed with this court, Interior seemed to admit that it has exempted explora-

tion activities affecting less than five acres from NEPA's requirements. *See* Defs.' Mot. in Opp'n to Pls.' Mot. for a Prelim. Inj. at 37; *see also* NMA Reply at 17 (taking for granted the fact that Interior does not perform a NEPA review for exploration activities of less than five acres).

**29.** State and private actors are not subject to NEPA. *Macht v. Skinner*, 916 F.2d 13, 18

ceives significant federal funding; [30] and (3) when the project is undertaken by a non-federal actor, whether the federal agency must undertake "affirmative conduct" before the non-federal actor may act.[31] *See generally Macht v. Skinner,* 916 F.2d 13 (D.C.Cir.1990) (touching on all three factors weighed by the court in this case). No single factor of these three is dispositive.

To date, only one case has explored a similar question to that which is presented here: whether Notice projects are major Federal actions within the meaning of the NEPA.[32] In *Penfold,* 857 F.2d 1307, the Ninth Circuit affirmed the district court's determination that BLM's regulatory actions regarding Notice-level operations are not major Federal actions requiring NEPA compliance. *Id.* at 1314 (holding that "as a matter of law BLM's approval of Notice mines without an [environmental assessment] does not constitute major federal action within the scope of NEPA"). While that finding is persuasive, *Penfold* need not necessarily constrain this court's inquiry. As *Penfold* itself noted, "decisions on federal action are not consistent between the circuits," and the Ninth Circuit has generally been reluctant to impose the NEPA requirement on actions "that are marginally federal." *Id.* (citing *State of Alaska v. Andrus,* 591 F.2d 537, 541 (9th Cir.1979)). Accordingly, the court will conduct its own analysis, before reaching a conclusion on this matter.

■ Applying the factors set forth above to the matter at hand, the court first finds that Notice projects are not federal projects, *per se.* They are private projects, undertaken in coordination with the Federal Government. This militates against plaintiffs' claim, but it does not end the inquiry. *See Macht,* 916 F.2d at 18

---

(D.C.Cir.1990). Accordingly, federal projects are, by definition, more likely to constitute "major Federal action" than non-federal projects.

**30.** "Typically, a project is considered a major federal action when it is funded with federal money." *Southwest Williamson County Cmty. Ass'n v. Slater,* 243 F.3d 270, 278 (6th Cir. 2001); *cf. Indian Lookout Alliance v. Volpe,* 484 F.2d 11, 16 (8th Cir.1973) ("any project for which federal funds have been approved or committed constitutes a major federal action bringing into play the requirements of NEPA").

**31.** In order for NEPA to apply to non-federal projects, the federal agency must engage in some "affirmative conduct." *State of Alaska v. Andrus,* 429 F.Supp. 958, 962–63 (D.Alaska 1977). "If ... the agency does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no affect on the agency's actions, and therefore NEPA is inapplicable." *Citizens Against Rails–to–Trails,* 267 F.3d at 1151; *see Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1244 (D.C.Cir.1980); *RESTORE: the N. Woods v. Dep't of Agric.,* 968 F.Supp. 168, 175 (D.Vt.

1997) ("[W]here there is minimal federal involvement, where the federal agency has no power to affect the proposed action, or where there is no action to be taken, NEPA does not apply."); *United States v. S. Fla. Water Mgmt. Dist.,* 28 F.3d 1563, 1572 (11th Cir.1994) ("The touchstone of major federal activity constitutes a federal agency's authority to influence nonfederal activity."); *Sierra Club v. Hodel,* 848 F.2d 1068, 1089 (10th Cir.1988); *Md. Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039, 1042 (4th Cir.1986) ("A nonfederal project is considered a 'federal action' if it cannot begin or continue without prior approval of a federal agency.") (internal quotations and citations omitted).

**32.** In *Penfold,* 857 F.2d 1307, the Ninth Circuit considered Interior's 1980 Regulations, not the 2001 Regulations. *Id.* at 1311. This does not significantly distinguish *Penfold,* however, because the 2001 Regulations are substantially similar to the 1980 Regulations- and even more narrow in pertinent respects. This is because, consistent with the recommendations made in the NRC Report, the 2001 Regulations only exempt small-scale *exploration* projects from review, while the 1980 regulations exempted *all* mining operations occurring on five or fewer acres.

("[F]ederal involvement in a nonfederal project may be sufficient to 'federalize' the project for purposes of NEPA."); *accord Md. Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039, 1043 (4th Cir.1986); *Winnebago Tribe of Neb. v. Ray,* 621 F.2d 269, 272–73 (8th Cir.1980); *Sierra Club v. Hodel,* 544 F.2d 1036 (9th Cir.1976); *Citizens Alert Regarding the Env't v. U.S. EPA,* 2003 WL 1889242, at *4 (D.D.C. Mar.15, 2003).

Second, the court recognizes that Notice projects are not federally funded. Again, this cuts against a finding for plaintiffs but is similarly non-determinative. *Southwest Williamson County Cmty. Ass'n,* 243 F.3d at 279 (stating that "federal funding is a significant indication that a project constitutes a major federal action; however, the absence of funding is not conclusive proof of the contrary") (citing *Historic Preservation Guild v. Burnley,* 896 F.2d 985, 990 (6th Cir.1989)); *see also e.g., Save Barton Creek Ass'n,* 950 F.2d at 1137.

Third and finally, this court concludes that Interior does not "approve" Notice exploration projects or take any other overt act in support thereof. 43 C.F.R. § 3809.312 (stating that no approval is required before a Notice operation can commence). Rather, under the 2001 Regulations, the Notice requirements are merely a method by which BLM obtains information and identifies potential law violators. *See* 43 C.F.R. §§ 3809.300–.336.[33] The court thus agrees with the district court in *Sierra Club v. Penfold:* "BLM uses the Notices as the basis for limited enforcement review and to target the distribution

of information"; Notices are a mere "ministerial reminder ... to encourage miners to comply with their legal responsibilities." *Sierra Club v. Penfold,* 17 Envtl. L. Rep. 21,058, 21058–60 (D.Alaska 1987). *See Citizens Against Rails–to–Trails,* 267 F.3d at 1151 (noting that NEPA does not apply when the agency's role is "merely ministerial"); *see also Macht,* 916 F.2d at 20.

In sum, the court finds that Notice exploration projects are undertaken by private actors without federal funds or approval. Consequently, the court concludes that Notice exploration projects are not "major Federal actions" within the bounds of NEPA, and plaintiffs' NEPA challenge must fail.

## IV. CONCLUSION

In sum, it is clear that mining operations often have highly significant—and sometimes devastating—environmental consequences. It is also clear that the 2001 Regulations, in many cases, prioritize the interests of miners, who seek to conduct these mining operations, over the interests of persons such as plaintiffs, who seek to conserve and protect the public lands. While such prioritization may well constitute unwise and unsustainable policy, with one exception, the court cannot find that the 2001 Regulations unreasonably implement the FLPMA, in violation of the Administrative Procedures Act, nor can the court conclude that the Secretary acted arbitrarily or capriciously in promulgating the 2001 Regulations, such that this court may intervene. Accordingly, with one ex-

---

**33.** At least fifteen days before beginning to mine, the Notice mine operator must provide the following information to BLM: (1) her name and address; (2) a description of the mining claim; (3) a description of the activities proposed and the start-up date; (4) a statement that reclamation of the disturbed areas will be completed and that reasonable measures will be taken to prevent unneces-

sary or undue degradation of the lands during operations; and (5) the cost estimate for reclamation activities. 43 C.F.R. § 3809.301. Then, after BLM has reviewed the information, if the information is incomplete, BLM sends the operator a return letter within fifteen days, requesting further information. 43 C.F.R. § 3809.311. If, on the other hand, the Notice is complete, BLM takes no action. *Id.*

ception, plaintiffs' facial challenge must fail.

For the foregoing reasons, plaintiffs' motion for summary judgment must be granted in part and denied in part, and Interior and NMA's motions for summary judgment must similarly be granted in part and denied in part. The 2001 Regulations shall be remanded to Interior for evaluation, in light of Congress's expressed policy goal for the United States to "receive fair market value of the use of public lands and their resources," 43 U.S.C. § 1701(a)(9). The 2001 Regulations are otherwise affirmed. An appropriate order accompanies this memorandum opinion.

## JUDGMENT

Pursuant to FED. R. CIV. P. 58 and for the reasons stated by the court in its Memorandum Opinion docketed this same day, it is this 18th day of November, 2003, hereby

**ORDERED and ADJUDGED** that the 2001 Regulations are **REMANDED** to the United States Department of the Interior for evaluation in light of Congress's expressed policy goal for the United States to "receive fair market value of the use of public lands and their resources," 43 U.S.C. § 1701(a)(9). The 2001 Regulations are otherwise **AFFIRMED.**